IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

RANDY MARTIN,

      Plaintiff,

v.                               No. 11-1204

PERFORMANCE BOAT BROKERAGE.COM,
LLC and MATTHEW EDWARD SMITH,

      Defendants

and

RSK CONTRACTING, INC.,

      Intervening Plaintiff

v.

RANDY MARTIN, BRETT MANIRE and
MARK WADDINGTON,

      Defendants in Intervention.

_____

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

      The Plaintiff, Randy Martin, brought this action on July 11, 2011 against the Defendants,

Performance Boat Brokerage.com, LLC and Matthew Edward Smith, for damages and injunctive

relief, alleging violations of the Tennessee Consumer Protection Act, Tennessee Code Annotated

§ 47-18-101, *et seq.*, as well as breach of contract, fraudulent inducement to contract, and fraud.

On April 30, 2012, RSK Contracting, Inc. ("RSK") filed an intervening complaint against

Martin.[1]  (D.E. 76.)  Before the Court is Martin's motion for summary judgment on RSK's claims. (D.E. 106.)

*STANDARD OF REVIEW*

The instant motion is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted).  "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party."  Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 748 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505).  "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted).

---

[1] On November 15, 2012, RSK amended its complaint adding as defendants Brett Manire and Mark Waddington. (D.E. 110.)

*FACTS*

The following facts relevant to the Court's determination of the motion are undisputed unless otherwise noted.  On July 14, 2011, this Court granted a preliminary injunction prohibiting the Defendants from selling the business known as Performance Boat Brokerage.com, LLC, or from selling assets thereof except in the normal and ordinary course of business, without permission of the Court.  (D.E. 8.)  On November 29, 2011, the Court granted Martin's petition for a prejudgment writ of attachment for all funds owed to Defendants Performance Boat Brokerage.com, LLC and/or Smith by Mark Waddington and/or Performance, LLC under an asset purchase agreement entered into on August 2, 2011.  (D.E. 46 & 47.) Plaintiff sought a second writ of attachment on February 28, 2012 for a 2004 Outer Limits Boat, Hull Identification Number OPL47014B404 (the "Outer Limits Boat"), owned by Defendant Performance Boat Brokerage.com, LLC.  (D.E. 59.)  In that petition, Martin represented to the Court that, according to a title search, the vessel had been titled in the name of Performance Boat Brokerage since 2008 and had no liens or mortgages against it.  (Id. at 4.)  Plaintiff advised the Court that the boat and its trailer were located in the showroom of Performance, LLC in Camdenton, Missouri.  (Id.)  The writ was executed by United States Marshals on February 29, 2012. (D.E. 62.)

In its intervening complaint, as amended, RSK alleged that, on October 31, 2009, it purchased the Outer Limits Boat and its trailer from Performance Boat Brokerage.com, LLC for $250,000.00.  (D.E. 110 ¶ 6.)  According to the intervenor, whose sole shareholder is Rick Brown, RSK held exclusive ownership of the vessel from that time on.  (Id. ¶ 7.)  During RSK's ownership, the boat was stored at Performance Boat Brokerage's Missouri facility, which was

3

initially owned by Smith and later sold to Brett Manire and Waddington.  (Id. ¶ 7.)  It is RSK's position that Martin misrepresented to the Court that Performance Boat Brokerage.com, LLC owned the boat.  (Id. ¶ 9.)  RSK seeks an order requiring that the vessel and two propeller drives also seized by United States Marshals be returned and that damages be awarded.  (Id. ¶¶ 13-18.)

*ASSERTIONS OF THE PARTIES AND ANALYSIS*

The issue before the Court is whether the unrecorded sale to RSK[2] of a federally documented vessel is valid as against Martin, a judgment creditor.  Plaintiff argues that it is not. In support of his assertion, the movant points to 46 U.S.C. § 31321, the recording statute relating to federally documented vessels, which provides that

> [a] bill of sale, conveyance, mortgage, assignment, or related instrument, whenever made, that includes any part of a documented vessel or a vessel for which an application for documentation is filed, must be filed with the Secretary [of the Department of Homeland Security] to be valid, to the extent the vessel is involved, against any person except . . . a person having actual notice of the sale, conveyance, mortgage, assignment, or related instrument.

46 U.S.C. § 31321(a)(1)(C); *see also* 46 U.S.C. § 31301(7).  The statute further states that "[e]ach bill of sale, conveyance, mortgage, assignment, or related instrument that is filed in substantial compliance with [§ 31321] is valid against any person from the time it is filed with the Secretary [of the Department of Homeland Security]."  46 U.S.C. § 31321(a)(2); *see also* 46 U.S.C. § 31301(7).

> The recording statute traces its roots back to the Vessel Sales and Mortgage Recording Act of July 29, 1850.  The Act of 1850 was passed, in part, to establish a federal clearing house of recorded instruments affecting title to federally documented vessels so that third parties had one place to look to for reliable information as to what claims, liens, or other encumbrances exist against the vessel.

---

[2] It is undisputed that RSK did not record its purchase of the vessel with the Department of Homeland Security.

Mullane v. Chambers, 333 F.3d 322, 332 n.8 (1st Cir. 2003) (internal citations omitted). "In 1920, Congress created the preferred ship mortgage, a new security device enforceable in admiralty, with priority over most maritime liens arising after perfection of the mortgage." Maryland Nat'l Bank v. Vessel Madam Chapel, 46 F.3d 895, 898 (9th Cir. 1995). "It was intended to encourage investment in the shipping industry by providing greater security to mortgagees." Id. The so-called Ship Mortgage Act required that sales and mortgages of documented vessels be recorded in the appropriate federal office. Id. "Coast Guard books are indexed to show the name of the vessel; name of the parties to the sale, conveyance or mortgage; time and date of the reception of the instrument; interest in the vessel sold, conveyed or mortgaged; and amount and date of maturity of the mortgage." Id. "A copy of the abstract of title and any recorded mortgage is available on any documented vessel." Id. "To become a vessel of the United States and obtain the federal documentation required for a preferred ship mortgage, the shipowner must meet a number of federal requirements, including proof of ownership through a chain of title." Id. The statute "protects the interests of those whose interests are properly recorded against those whose interests are not." Id. at 899. Stated differently, once a vessel is federally documented, the interests of one who later purchases the boat but does not record the later transfer are not protected. See id.

Martin has averred herein that, upon learning Smith and/or his company, Performance Boat Brokerage.com, LLC, had an unencumbered asset in the form of the Outer Limits Boat, he obtained a title search through the United States Coast Guard and verified that one or both of the Defendants bought the boat in 2008, documented the purchase with the Coast Guard, and remained the record owner of the vessel. He also alleges that he never heard of RSK or Rick Brown until after the seizure occurred.

The Plaintiff has provided to the Court a document titled "General Index or Abstract of Title" purportedly issued by the Department of Homeland Security, United States Coast Guard, relative to the Outer Limits Boat.  (D.E. 59-1.)  The form reflects that a December 18, 2008 bill of sale for the vessel from Outerlimits Offshore Powerboats Ltd. to Performance Boat Brokerage was recorded with the Coast Guard's National Vessel Documentation Center ("NVDC") on December 31, 2008.  (Id. at 2.)  No subsequent transfers appear on the abstract of title.  (Id.)  The document was initially submitted to the Court in connection with Martin's petition for a second writ of attachment for the boat.

RSK asserts that this alleged abstract of title, referred to by Martin in connection with the instant motion to establish that the Outer Limits Boat was federally documented in accordance with § 31321, should not be considered by the Court because it is not properly authenticated. Rule 56 was amended in December 2010.  *See* Siggers v. Campbell, 652 F.3d 681, 691 n.6 (6th Cir. 2011).  As courts in this circuit have recognized, "[i]n some respects, the 2010 amendment to Rule 56 works a sea change in summary judgment procedure and introduces flexibility in place of the bright-line rules that obtained previously, including Rule 56(e)'s unequivocal direction that documents presented in connection with a summary judgment motion must be authenticated."  Harden v. AlliedBarton Sec. Serv., No. 3:10-00779, 2013 WL 2467714, at *8 (M.D. Tenn. June 7, 2013) (citing Foreword Magazine, Inc. v. OverDrive, Inc., No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011)) (internal quotation marks omitted), *recons. denied* 2013 WL 3974178 (M.D. Tenn. Aug. 1, 2013).  Rule 56(c) permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  The objection contemplated under Rule 56 as amended "is not that the material has not been submitted in admissible form, but that

it cannot be."   Harden, 2013 WL 2467714, at *8 (internal quotation marks omitted).   As indicated in the advisory committee notes, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting.   The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."   Fed. R. Civ. P. 56, advisory comm. notes (2010 amendments, Subdivision (c)); see also Foreword Magazine, 2011 WL 5169384, at *2.

RSK argues that the affidavit of Drew Davis submitted by Martin contemporaneously with the form was inadequate to authenticate it.   According to his affidavit, Davis, a managing member of Midwest Documentation Services, LLC, used the titles attached thereto and provided them in the normal course of his business.   (D.E. 59-6 ¶¶ 2-3.)   The affiant further averred that the abstract of title appended to his affidavit was true and correct to the best of his knowledge and belief and that "Performance Boat Brokerage owns the Outer Limits boat, HIN # OPL47014B404, and has owned it since December 18, 2008, when the title was transferred from Outerlimits Offshore Powerboats LTD to Performance Boat Brokerage."   (Id. ¶ 5.)   The Intervening Plaintiff points out that the abstract of title was not in fact attached to the affidavit and argues that the statement contained in paragraph five constitutes inadmissible hearsay because it is based on the unauthenticated abstract.

In response, Martin explains that the abstract was inadvertently filed out of order with respect to Davis' affidavit, having been placed on the docket ahead thereof rather than behind.   A corrected affidavit with documents placed in the proper order was filed as an exhibit to Plaintiff's reply brief.   (See D.E. 113-1.)   Plaintiff also submits that the affidavit meets the requirements of Rule 901 of the Federal Rules of Evidence, which provides that, in order to properly authenticate or identify "an item of evidence, the proponent must produce evidence

sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). An example of evidence sufficient to satisfy the Rule is testimony by a witness with knowledge that the item "is what it is claimed to be." Fed. R. Evid. 901(b)(1); *see also* Alliant Tax Credit Fund 31-A, Ltd. v. Murphy, 494 F. App'x 561, 572 (6th Cir. 2012) ("Evidence is properly authenticated when a witness with knowledge testifies that the evidence is what it claims to be"). "The burden of proof for authentication is slight." Gregg v. Ohio Dep't of Youth Servs., 661 F. Supp. 2d 842, 852 (S.D. Ohio 2009). "That is, a party need only put forth enough evidence that a reasonable juror could find the document is what it is purported to be." Conner v. City of Jackson, No. 08-1146, 2009 WL 3429690, at *3 (W.D. Tenn. Oct. 19, 2009) (internal quotation marks omitted). The Court finds that the Plaintiff has presented sufficient evidence that a reasonable juror could find the abstract is what it purports to be. Indeed, RSK has not suggested that the abstract is not what it purports to be or that it cannot be authenticated. Accordingly, the Court may properly consider it in ruling on the instant motion. *See* Harden, 2013 WL 2467714, at *8 (where there was no indication proffered evidence was not what it was purported to be or that it could not be authenticated, court could consider it when ruling on motion for summary judgment).

Having determined for purposes of summary judgment that, based upon the abstract of title, the Outer Limits Boat was a federally documented vessel in accordance with the statute, the Court will proceed with its § 31321 analysis. In order to be protected from unrecorded bills of sale, one must be included in the category of "any person." *See* 46 U.S.C. § 31321(a)(1). In support of his position that he, as a judgment creditor, is entitled to such protection, Martin relies on the First Circuit's opinion in Mullane. The issue before the court therein was the same as that

present here – whether an unrecorded bill of sale purporting to convey a federally documented vessel was valid as against a judgment creditor.  Mullane, 333 F.3d at 325.

The court began by recognizing that "[i]n construing the terms of a statute, [courts are to] start with the statutory text, according it its ordinary meaning by reference to the 'specific context in which that language is used, and the broader context of the statute as a whole,' and that, "[w]hen the statutory language is plain and unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances."  Id. at 330 (citing Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997) & Rubin v. United States, 449 U.S. 424, 430, 101 S. Ct. 698, 66 L. Ed. 2d 633 (1981)) (some internal quotation marks omitted).  It concluded that no rare or exceptional circumstances existed with respect to § 31321, stating that

> [t]here is nothing ambiguous about the term "any person."  Congress chose the broadest possible term to describe the third parties it intended to protect, and did not qualify the term in any way.  The statute as written thus extends protection to any creditors, *including judgment creditors* . . ., who rely upon the record title of the vessel.

Id. at 330-31 (emphasis added).  The court found that its reading of the subsection was "reinforced when considering its remarkable breadth when compared with the language Congress has used in other recording statutes," citing 7 U.S.C. § 2531(d) ("[C]onveyance . . . shall be void as *against any subsequent purchaser or mortgagee for a valuable consideration,* without notice, unless it . . . is filed for recording in the Plant Variety Protection Office . . ."); 17 U.S.C. § 1320(d) ("[C]onveyance . . . shall be void as against *any subsequent purchaser or mortgagee for a valuable consideration,* unless it is recorded in the Office of the Administrator . . ."); 35 U.S.C. § 261 ("[C]onveyance shall be void as against *any subsequent purchaser or mortgagee for a valuable consideration*, without notice, unless it is recorded in the Patent and Trademark Office . . ." ), and commented that "[i]f Congress meant to exclude a particular class

9

of persons from the protection of § 31321(a)(1), it certainly knew how and could have done so clearly and explicitly." Id. at 331 (emphasis added). The Mullane opinion further articulated that

> [o]ur acceptance of the term "any person" at face value is further buttressed by the overall purpose of the subsection. The language of subsection 31321(a)(1), like that of other recording statutes, reveals a legislative intent to protect third parties who rely upon the title records of the vessel. Like other creditors, judgment creditors rely upon these documents at expense and risk. If a wrongful levy is made on a vessel, which is then sold at a sheriff's sale, they could be held liable for trespass, conversion, and damages, and would be responsible for their own legal fees in defending the levy against unrecorded interests.

Id. Finally, the First Circuit observed that the statute has been reenacted on two occasions without change to the term "any person." Id. at 332.

At least one court in this Circuit has cited Mullane with approval. In re Tomlinson, 347 B.R. 639 (E.D. Tenn. 2006), the district court decided, with respect to a provision of the Federal Aviation Act, to "join[] those courts holding that transfers of aircraft not recorded in accordance with the [statute] are invalid as to *judgment creditors*." In re Tomlinson, 347 B.R. at 645 (emphasis added). In doing so, the court noted that other courts had reached the same conclusion under an analogous provision of § 31321, referencing Mullane. Id. at 645 n.5.

In response to Plaintiff's assertions, RSK points out that the analysis set forth in Mullane is not universal, citing to Fort Pitt National Bank v. Williams, 9 So. 117 (La. 1891) and Richardson v. Montgomery, 1865 WL 4545 (Pa. 1865).[3] Both courts, in cases involving the Ship Mortgage Act, relied on general common law principles to conclude that a judgment creditor had no greater rights than those of a debtor. Williams, 9 So. at 118; Richardson, 1865 WL at *4-6. In the former the court remarked that, while the question was "not free from doubt," it had been

---

[3] Neither of these cases has been cited by any decision in this Circuit.

referred only "to sundry decisions, federal and state, which strongly intimate that the object and effect of the statute [was] simply to protect persons who have dealt on the faith of the recorded title, and as to whom it would be a fraud to give effect to unrecorded titles to their detriment," a club that excluded judgment creditors.  Williams, 9 So. at 119.  Based on these cases, RSK insists that Martin had only those rights to the Outer Limits Boat as the debtor held thereto.

The Mullane plaintiffs also relied on Williams and Richardson, and to no avail.  The First Circuit stated as follows:

> Simply relying upon the common law principle of "first in time, first in right" is unpersuasive.  At common law, without the benefit of recording statutes, this same principle applied to subsequent purchasers and mortgagees.  If A conveyed property to B and then made an identical conveyance to C, B prevailed over C on the theory that A no longer had any interest to convey.  Taking the argument to its logical terminus then would lead to the unpalatable result that subsequent purchasers would not be protected by the vessel statute on the ground that when they purchased the vessel, the vendor no longer had an interest to sell.  But the recording act changed this result. Moreover, while it is ordinarily true that the rights of an attaching or judgment creditor do not have priority over a prior unrecorded conveyance, many states have abrogated this principle by protecting creditor's rights through a recording statute [including Tennessee.  *See* Tenn. Code Ann. § 66-26-103].[4]  And to say that judgment creditors who rely "on the faith of the recorded title" when levying their execution do not do so "to their detriment" is baseless.  As we said, judgment creditors may rely upon title records at the risk of being held liable for trespass, conversion, and any damage sustained to the vessel during a wrongful levy.
>
> Most important, these courts point to no textual basis for saying that subsection 31321(a)(1) applies to purchasers and mortgagees alone.  Certainly Congress is not required to list every "person" it had in mind when it says that it is protecting "any person."  In short, without some indication from Congress that it intended to exclude judgment creditors, we will not engraft such a policy limitation on the statute.  As instructed by the Supreme Court, courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also

---

[4] The statute provides that "[a]ny instruments not so registered, or noted for registration, shall be null and void as to existing or subsequent creditors of, or bona fide purchasers from, the makers without notice."  Tenn. Code Ann. § 66-26-103.

the last:  judicial inquiry is complete.  Because subsection 31321(a)(1) is explicit as to whom it protects, our inquiry is at an end.

Mullane, 333 F.3d at 332-33 (citations & some internal quotation marks omitted).  In articulating its position, the court acknowledged that recording statutes such as § 31321(a)(1) can often have harsh results, but added that the plaintiffs "had a means to protect their interests:  they could have filed their bill of sale . . . pursuant to subsection 31321[(a)](1).  This they failed to do."  Id. at 333 n.9.

The Court finds the First Circuit's thoughtful analysis in Mullane compelling and adopts it here.  Like the First Circuit, the undersigned finds no basis for concluding that Congress intended to exclude judgment creditors from § 31321(a)(1)'s purview.

The inquiry does not end here, however, as the statute, to no matter whom it applies, protects only those without actual notice of the unrecorded transfer at the time of the attachment. The parties are at odds as to whether Martin possessed such notice.

Regretfully, there is a dearth of caselaw on what constitutes "actual notice" under § 31321.  The Second Circuit considered the meaning of the term in the Ship Mortgage Act in The Tompkins, 13 F.2d 552 (2d Cir. 1926).  The court defined actual notice as actual knowledge or "knowledge of such facts as would lead a fair and prudent man, using ordinary thoughtfulness and care, to make further accessible inquiries."  The Tompkins, 13 F.2d at 554.  The court distinguished actual notice from constructive notice, which it described as "a legal inference from established facts."  Id.  Cases citing The Tompkins have applied its definition of actual notice in analyzing similar provisions of the Federal Aviation Act, as the Ship Mortgage Act was used by Congress as the model for the federal aviation recording statute. See Shacket v. Philko Aviation, Inc., 841 F.2d 166, 170 (7th Cir. 1988); Marsden v. S. Flight Serv., Inc., 227 F. Supp.

411, 416 (D.N.C. 1961).  In <u>Shacket</u>, the Seventh Circuit reasoned that "actual notice" included "implied actual notice."   <u>Shacket</u>, 841 F.2d at 170.  This type of notice requires "(1) actual knowledge of (2) highly suspicious circumstances, coupled with (3) an unaccountable failure to react to them.  This in turn is a shade short of the form of actual knowledge that consists of closing your eyes because you're afraid of what you would see if you opened them."  <u>Id.</u> at 171.

In order to determine whether Martin had actual notice of the sale to RSK at the time of the seizure, the Court considers the following excerpts from the deposition testimony of Martin's attorney, Teresa Luna; Brett Manire; Manire's counsel, Jonathan Steen; Mark Waddington; and the Plaintiff as cited by the parties.

*Luna's Testimony:*

Q:   Okay.  Thank you.  When were you first made aware of the [Outer Limits] boat?

A:   The day that Jonathan Steen called me and told me about the boat.

\*     \*     \*

Q:   . . . And as I understand your testimony, the first time you became aware of the [Outer Limits] boat was when Mr. Steen told you about it on [February 17, 2012], correct?

A:   I remember it was mid-February, and looking at this, it appears that the 17th is the first time that we talked about it.

\*     \*     \*

Q:   Okay.  And what did he tell you about the [Outer Limits] boat when he called you?

A:   Well, the gist of the conversation was that he knew of some property that was owned by the defendant.

Q:   What Defendant?

A:     Matthew Smith, or his company, and that he would be willing – his client would be willing to provide my client with information regarding that property.

Q:     And was the property the [Outer Limits] boat?

A:     Yes.

*     *     *

Q:     Okay.  Did he tell you – what else did he say during that conversation?

A:     The one about the [Outer Limits] boat?

Q:     Yes.

A:     We talked about the title to the boat, how it was titled, where it was titled.

Q:     Did he provide you with information about the title of the boat and where it was titled?

A:     He told me what the title showed, who owned the boat –

Q:     What it –

A:     Who it listed as the owner of the boat, the day of the transfer of title to the defendants.

Q:     Did he say anything else during that conversation?

A:     He has some answers in response to some of my questions.

Q:     And what did you ask him?

A:     I asked him about the ownership of the boat.  I asked him several questions about the ownership of the boat.

Q:     Tell me what those questions were.

A:     Was it still owned by the defendants.  I asked him did anybody else have any liens on it.  I asked him did anybody own the boat with the defendants.  Questions of that nature.

Q:     And what did Mr. Steen say when you asked him if the boat was still owned by the defendants?

14

A:     I don't remember verbatim, you know, what he said, but the gist of what I remember him saying was that, yes, it's still titled – still titled in the defendant's name.  No one has transferred the title.

Q:     What did he say when you asked him if anybody else had a lien on the boat?

A:     That there were no liens on the boat, that it was a free and clear title.

Q:     What did he say when you asked him if anyone owned the boat with the defendants, Matthew Smith and his company?

A:     He said – and I think that the word "involved" might have been used, but he said there was someone else, and I'm not – I don't know if he knew the name or not, but there was someone else, and he thought that it was maybe a divorce situation where this was a husband trying to hide assets.  He didn't know if that was the case – but that the title was in the defendant's name.  He did say that he thought that Matthew Smith had forgotten that he owned this boat.

Q:     Did he say why he thought that?

A:     I don't remember him saying why.  He did say that someone might have – when he told me about the divorce situation, it was after he said someone might have bought the boat.  Jonathan wasn't sure, but if there were someone who did, then it was – he thought it was a divorce situation where there was a need to hide the assets and didn't want it in his name.

Q:     But I thought you said earlier that he didn't know whether that was the case or not.

A:     I don't think he did know that.

                    *        *        *

Q:     . . .  What other questions did you ask him during that conversation?

A:     Well, see, I had not seen the title, and so I was asking if anybody else's name was on the title, if any other owner was listed on the title besides the defendant.  And he – I believe he told me that, no, there were no other ones that were – no other names that were listed on the title.

                    *        *        *

15

Q:      Tell me everything else that you said to Mr. Steen and Mr. Steen said to you during that conversation.

A:      We talked about where the boat was.

Q:      Where did he tell you the boat was?

A:      He didn't tell me where the boat was in that conversation.

                              *        *        *

Q:      Okay.  What else did you say to Mr. Steen or did he say to you during that telephone conversation?

A:      We talked about how we would – I think a seizure process and the marshals, and vaguely how we could attach that boat.

                              *        *        *

Q:      And you were having this conversation with Mr. Steen?

A:      Well, I think it was a logistics conversation about where – it was – where the boat was, where it would be, when it would be available.

                              *        *        *

Q:      So when you hung up the phone after that conversation, you didn't know where the boat was or how long it was going to be there; is that correct?

A:      That's correct.

                              *        *        *

Q:      And what information did he give you?

A:      The buyer's name, which would have been the defendant's name.  The – I believe he gave me the price, the dates, maybe dates of purchase, and maybe dates of title as well, but we did discuss some dates that were on the abstract title.  We talked about –

Q:      Tell me –

A:      -- logistics of where the boat was, how to get it.

Q:      Okay.

                                    16

A:      Providing the – you know, the property, you know, maybe to satisfy any judgment that my client would get.  Those were the general topics that we talked about.

                        *        *        *

Q:      Okay.  During that first conversation with Mr. Steen about the [Outer gooLimits] boat, did he say anything to you about Rick Brown or RSK Contracting, Inc.?

A:      No.

                        *        *        *

Q:      Okay.  So you knew when you hung up from that conversation that someone else might have bought the boat from Matthew Smith, correct?

A:      I knew that someone else could have bought the boat, but that it was – there was an attempt to – it was not public and it was sort of a hidden asset.  That's what I understood.  One other thing, looking at my notes, about three-fourths of the way down on the first page, when we were talking about the titles being recorded, I believe that Jonathan also told me that there was no title recorded for it in Missouri; that it was recorded with the Department of Homeland Security.  I think there was some clarification there.

                        *        *        *

Q:      . . .  [A]bove where it says, Titles recorded, it looks to me like that says, Someone bought boat from M. Smith.  Is that what those notes say?

A:      That's what it says

Q:      Okay.  And that's your handwriting?

A:      That is.

Q:      And did you – did you make that notation, Someone bought boat from M. Smith, during that first telephone conversation that you had with Mr. Steen about the [Outer Limits] boat?

A:      I believe it was during the first conversation.  I'm not totally sure, but I believe it was.

\*  \*  \*

Q: . . .  You said that you had one other conversation with Mr. Steen about the [Outer Limits] boat?

A: At least one other one –

Q: Okay.

A: -- that I remember.  It was to get more information that I needed for the title search.

Q: Do you know when that conversation took place?

A: I don't remember.  It was fairly soon after that, but I don't remember the exact date and time.

\*  \*  \*

Q: . . . [Y]ou do believe that that second conversation with Mr. Steen took place on February 22nd, correct?

A: It appears that it did, from looking at my records.

\*  \*  \*

Q: Okay.  Tell me what you remember you saying to Mr. Steen and Mr. Steen saying to you during this second conversation that we have been talking about.

\*  \*  \*

A: I believe that the second conversation would have been on – reflected mostly on the back of the page of my notes where I told him that the title searcher needed the whole number to be able to do a title search.  And I also believe in the second conversation we asked about – I asked about and got answers to and we further discussed where the boat was and when it would be there and where Matthew Smith would be during the time of the – any seizure that came up.  And we talked about – that's where I got the name the G unit.[5]  I got the whole number.  I believe that I asked again about the name of anybody else involved and I believe that the answer that I got was due to the privacy that they afforded their customers, that that's all that they could tell me.

---

[5] The "G unit" and the Outer Limits Boat are the same vessel.  (D.E. 106-1 at 3 n.3.)

Q:    You said anybody else that might be involved, what do you mean by that?

A:    Well, if you remember in the first conversation that I had with Mr. Steen, he told me that somebody else – they're not listed on the title but there is somebody else who might be involved in the ownership or they thought might have bought the boat.  So I asked again about that and asked for names and I believe that the answer was that this was all that he could tell me because of the privacy of their customers.

Q:    So you asked for additional information about this other possible owner of the boat and Mr. Steen told you that he could not provide you with that information because of his client's – because of privacy concerns of his client's customers?

A:    You know, it was probably – the question was that – is there anything else that I can find out about the boat and I believe that the name of anybody else involved in it came up as well, and the – I do remember conversations that he responded to me was that he had to be very careful because they respected their customers and their clients and had this issue with Mr. Smith.  And Mr. Smith was kind of a volatile sort, and his clients had bought the business from Mr. Smith; that you never know what Smith was going to do.  And I knew Mr. Steen was being careful about the answer that he gave to me.

                              *       *       *

Q:    Okay.  But at the time of that second conversation that you had with Mr. Steen about the [Outer Limits] boat, you were concerned enough about the possibility that someone might have bought the boat from Matthew Smith or that someone might have an ownership in the boat to the extent that you asked Mr. Steen about that issue again, correct?

A:    Yes.

                              *       *       *

A:    And I will tell you why, because right after I got this information, I contacted the state of Missouri – I believe it's called the Department of Titling, and did my best to sell it to several offices and departments, did my best to see if there was any possible way if somebody had titled it in the state of Missouri or had it registered it or licensed it or had done something within the state of Missouri, that I could find out who that person was.  So, you know, I asked him questions that might help me in that search.  So I knew once I got the whole number I would be about to

get this title – abstracted title that he was telling me about.  But I wanted to make sure the person had not registered it, licensed it, titled it in the state of Missouri at the state level, and unless it is still titled it – in – at the Department of Homeland Security.

Q:     Okay.

A:     So that's why those questions were – that's why some of those question[s] were being asked because I – you know, that was my next step and that's exactly what I did after that, was to contact the state of Missouri and get passed from office to office.  And I learned that they couldn't tell me – you know, they didn't have any record of it, you know, from what I had given them.  I later learned there was no record of it.

Q:     And when you asked Mr. Steen for this additional information concerning this possible other owner of the boat, he told you that he could not give you any additional information because of his concerns involving his customer's privacy; is that correct?

A:     I'm not sure that Jonathan Steen knew who the owner of the boat was – or, I mean, not the owner, but who had potentially bought it or somebody claimed to have bought it.  I'm not sure that he knew that.  But I knew that some of the questions that I asked he was unable to tell me, and I wrote down due to privacy of customers.

                              *        *        *

A:     I was specifically asking for any other information that I could use to try to find in the state of Missouri, if there had been a title or license.

                              *        *        *

Q:     How would you word it?

A:     That at some point I would know where the boat was.

Q:     And Mr. Steen told you that?

A:     Yes.

                              *        *        *

Q:     Does that mean – did you – when you wrote that, did you mean that there were other parties involved?

20

A:      It's what I told you a little while ago.  That there's not anybody specifically listed on the title that was involved, but there may have been someone else silently involved.  And, again, that prompted me to go do a title search of the Department of Homeland Security and go to the state of Missouri to see if I could find anything.

\*      \*      \*

Q:      Had you ever heard of RSK or Rick Brown prior to the [Outer Limits] boat being attached on February 29, 2012?

A:      No.  Not – no, I don't remember any recollection of hearing of them and certainly not associated with this boat.

(D.E. 170 at 10, 15- 20, 22-24, 26-27, 31, 34-38, 45-51, 62, 67, 82.)

*Manire's Testimony:*

Q:      Okay.  Mr. Manire, prior to the attachment of the [Outer Limits] boat on February 29th, 2012, did you ever have any verbal or written communications with Randy Martin, Teresa Luna, or anyone in her law firm about the [Outer Limits] boat?

A:      Possibly.

Q:      I'm sorry, possibly?

A:      Correct.

Q:      Tell me what you mean by "possibly."

A:      Possibly with Randy Martin.

Q:      All right.  Tell me – tell me what conversations that you possibly had with Mr. Martin.

A:      Very generic – if – when I recall – if I can recall, they've been very generic conversations about the boat.

Q:      Tell me what you recall about those generic conversations.

A:      I don't recall the details, just generic possibilities of the boat's motors and paint job and then speed capabilities.

21

Q:      Okay.  It sounds like you may have spoken to Mr. Martin about the
        characteristics and capabilities of the [Outer Limits] boat; is that correct?

A:      If I can recall.  I don't exactly remember what our conversation would
        have been about, but it would have been just about some generalities of
        the boat.

Q:      Okay.  Do you recall speaking with Mr. Martin prior to the attachment of
        the [Outer Limits] boat beside about anything relating to the [Outer
        Limits] boat besides its capabilities and characteristics?

                        *        *        *

A:      I do not.

Q:      Okay, so as I understand your testimony, the only thing that you recall
        speaking with Mr. Martin about, with regard to the [Outer Limits] boat
        prior to its attachment, would be the physical characteristics and
        capabilities of the boat; is that correct?

A:      Correct.

                        *        *        *

Q:      Say your answer again.

A:      Correct.

Q:      Okay.  Prior to the attachment of the [Outer Limits] boat, did you ever
        have any conversations with Randy Martin about the ownership of the
        [Outer Limits] boat?

                        *        *        *

A:      I did not.

Q:      Prior to the attachment of the [Outer Limits] boat, did you ever tell Mr.
        Martin that RSK or Rick Brown had an ownership interest in the boat?

                        *        *        *

A:      It was common knowledge that Rick Brown owned that boat.

Q:      Okay.  That's not my question to you, sir.  My question to you, is prior to the attachment of the [Outer Limits] boat did you ever tell Randy Martin that Rick Brown or RSK had an ownership interest in the boat?

A:      Possibly.

Q:      Well, what do you mean when you say, "possibly"?

A:      We always referred to that boat as Rick's boat, Rick Brown's boat.

Q:      So prior to the attachment of the [Outer Limits] boat, you had conversations with Randy Martin where you and Mr. Martin referred to the [Outer Limits] boat as Rick's boat; is that correct?

A:      That is correct.

                        *       *       *

Q:      And is it your understanding that Mr. Martin knew who Rick Brown was prior to the attachment of the [Outer Limits] boat?

[Attorney discussion]

Q:      Mr. Manire, prior to the attachment of the [Outer Limits] boat, did you and Mr. Martin have any specific discussions regarding the fact that Rick Brown owned the [Outer Limits] boat?

                        *       *       *

A:      Just like I already said, the boat was assumed to be Rick Brown's boat, so if it was talked about, it was Rick Brown's boat.

Q:      So if it was talked about between you and Mr. Martin it was Rick Brown's boat, correct?

                        *       *       *

A:      Yes.

                        *       *       *

Q:      That is Bruce – for Mr. Manire's benefit, this is Bruce Smith, counsel for Mr. Martin and Teresa Luna.  The testimony as taken requires clarification as to the timing of conversations.  The objection noted by Mr. Purcell, we are not waiving our right to attempt to obtain that information and

clarification through other means, through – at a different time.  And we understand that there will be no objection or claim of waiver by us not pursuing that today, not attempting to contact the Court today, and obtain a ruling which this Court does not do anyway.  So we will not pursue the question today, and utilize other means to obtain the clarification that we need.

(D.E. 172 at 11-16, 18-19.)

*Steen's Testimony:*

Q:    Do you recall when you first spoke to Ms. Luna about the [Outer Limits] boat?

A:    Not specifically.

Q:    Do you recall that it was in mid-February of 2012?

A:    Yes.  I do recall that it was in mid-February of 2012.

*       *       *

Q:    With regard to this mid-February telephone conversation that you had with Ms. Luna, tell me what you said to Ms. Luna and she said to you with regard to the [Outer Limits] boat.

A:    I don't remember specific details of the conversation other than in response to a question about assets belonging to the defendants.  We discussed a boat that may have belonged to one of the defendants in the underlying action.

Q:    And was that the [Outer Limits] boat?

A:    Yes.

Q:    Okay.  So you said that she asked you about assets belonging to the defendants.  Do you recall specifically what she said about that?

*       *       *

A:    I don't remember her specific words.  I just remember the conversation involved an inquiry into assets that may belong to the defendants in the action that were not transferred in the asset purchase agreement.

24

Q:     Okay.   Tell me what you remember saying to Ms. Luna about the ownership of the [Outer Limits] boat.

A:     I told Ms. Luna that there was a public document that appeared to indicate Matthew Smith or his company had an interest in a boat.

Q:     And that was the [Outer Limits] boat?

A:     Yes.

Q:     Did you tell her anything else about the ownership of the [Outer Limits] boat during that particular conversation?

A:     Yes.

Q:     What?

A:     I recall saying that my understanding was there was another individual who had purchased the boat, financed the boat, or had some financial interest in the boat.

Q:     Did you tell her who that individual was?

A:     I don't remember.

                              *        *        *

Q:     What else did you say to Ms. Luna regarding the ownership of the [Outer Limits] boat during that initial conversation?

A:     I remember saying that I did not know boats or ownership boats, kind of like black acre and, you know, what can -- constitutes the ownership of something, and that the information I had was – there was a title document or I didn't even know what it was called at the time.  But there was a document that would indicate Matthew Smith or his company would have an interest in the boat, and that there was an individual who also may have an interest in the boat.

                              *        *        *

Q:     What did she say to you in response to these statements that – that you made?

                              *        *        *

25

A:      I believe she asked questions about more details of the particular boat, but I don't remember specific questions.

                              *        *        *

Q:      Prior to the attachment of the [Outer Limits] boat, did you have another conversation with Ms. Luna about the [Outer Limits] boat?

A:      Yes.

                              *        *        *

Q:      Okay.  And tell me what you said to Ms. Luna and Ms. Luna said to you during that second conversation.

A:      I believe Ms. Luna asked about more information in order to do a title search on the boat.

Q:      Do you recall specifically what she asked for?

A:      No, I don't.

Q:      Do you recall what you said to her in response to that request for more information?

A:      I do recall providing a hull number, but other than that I don't remember specific details about what my response was.

                              *        *        *

Q:      Prior to the attachment of the [Outer Limits] boat, did you ever tell Ms. Luna that RSK [C]ontracting had any ownership interest in the [Outer Limits] boat?

A:      No.

Q:      Prior to the attachment of the [Outer Limits] boat, did you ever tell Ms. Luna that Rick Brown had any ownership interest in the [Outer Limits] boat?

A:      I don't remember.

                              *        *        *

26

Q:      Okay.  My question to you now is, prior to the attachment of the [Outer Limits] boat, did you ever mention RSK Contracting or Rick Brown to Ms. Luna in the context of discussing the [Outer Limits] boat[?]

A:      I don't remember.

(D.E. 169-1 at 11-18, 20.)

*Waddington's Testimony.*

Q:      . . . Your attorney has provided me with an e-mail dated February 22nd, 2012 from you to Mr. Steen and Ms. Luna, and Mr. Manire was copied on that e-mail.  And the e-mail says, Jonathan – this is a quote.  Jonathan, it would be very helpful to have coordination of any pickup to avoid logistic issues at the office.  Please have someone contact Brett prior to showing up at the office, thank you, Mark.  And that's the end of the quote.  Other than that e-mail, do you have any other documents that are responsive to the request for production that I just read to you?

A:      No.

Q:      Prior to the attachment of the [O]uter [L]imits boat on February 29th, 2012, did you ever have any verbal or written communication with Randy Martin, Teresa Luna, or anyone in her law firm about the [O]uter [L]imits boat?

A:      No.

Q:      So you never spoke to Randy Martin about the [O]uter [L]imits boat before it was attached on February 29th, 2012; is that correct?

                          *        *        *

A:      No.

                          *        *        *

Q:      So you never had any conversations with Randy Martin about the [O]uter [L]imits boat before it was attached on February 29th, 2012; is that correct?

> A:     Correct.  I had no communications with Randy Martin regarding the [O]uter [L]imits boat.
>
> Q:     Okay.  Did you ever overhear any conversations between Brett Manire and Randy Martin regarding the [O]uter [L]imits boat before it was attached?
>
> *     *     *
>
> A:     No.

(D.E. 173 at 10-12, 14.)  In his deposition, Martin denied ever talking with Manire or Waddington about the Outer Limits Boat.  (D.E. 106-4 at 7.)

In analyzing this evidence, the Court again finds helpful guidance in Mullane.  On appeal, the First Circuit noted that the lower court made no factual findings as to whether the defendants had actual notice at the time of the levy and remanded for a determination on that point.  *See* Mullane, 333 F.3d at 333.  As referenced briefly above, the issue in Mullane was whether an unrecorded bill of sale purporting to convey a vessel properly documented under § 31321(a)(1), the M/Y Cent'Anni, formerly known as Lady B Gone, from David and Angela Murphy to Dr. David Mullane was valid against judgment creditors Adele Chambers and Jean Farese.  Mullane v. Chambers, 349 F. Supp. 2d 190, 191-92 (D. Mass. 2004), *aff'd* 438 F.3d 132 (1st Cir. 2006).  Dr. and Mrs. John Walsh conveyed the vessel M/Y Lady B. to the Murphys, who recorded the transfer pursuant to § 31321 and changed the name to Lady B Gone.  Id. at 192.  In 1998, they sold the boat to Mullane, who did not record the bill of sale with the Coast Guard until September 1998.  Id.  Chambers and Farese obtained money judgments against the Murphys in November 1996 and April 1998 and sought to levy against their property.  Id.

Evidence was submitted showing Chambers learned from the Coast Guard that the Murphys owned a vessel named Lady B Gone.  Id. at 194.  She went to the marina prior to the seizure, which occurred in August 1998, to see if she could locate it.  Id.  She asked an

28

unidentified man at the dock whether he knew where she could find the Lady B Gone and the

man responded, "That boat is no more.  The owners have a new boat called the Cent'Anni."  Id.

In addition, Salim Tabit, counsel for Chambers and Farese, had knowledge that the ship's

mortgage had been discharged.  Id. at 195.  The court concluded, relying on The Tompkins,

Marsden and Shacket, that this evidence was insufficient to establish actual notice to Chambers

and Farese of the sale to Mullane, stating:

> Chambers could reasonably have assumed that the Murphys themselves changed
> the name.  Furthermore, the name change appears even less suspicious when
> viewed in the context of the surrounding events.  Despite ample opportunity at the
> time of the levy, the Murphys never even mentioned the Mullanes as possible
> owners of the vessel.  Any vague suspicions regarding the ownership of the vessel
> would have been wiped away by the Coast Guard's confirmation at the time of the
> levy that the Murphys were the recorded owners of the vessel and by the fact that
> the Murphys were living on the vessel with their pets and personal belongings
> when the Sheriff's Department arrived to seize the vessel.

> With regard to the discharge of the mortgage, the [c]ourt makes two observations.
> First, the discharge of a preferred ship's mortgage in the amount of $100,095 to
> Eastern Bank, dated July 17, 1998, did not contain the name of anyone other than
> the Murphys.  That document alone would not necessarily lead one to suspect that
> it was Mullane who discharged the mortgage.  In fact, Tabit presumed that the
> Murphys had paid off the mortgage themselves and now had sufficient equity in
> the vessel to satisfy his clients' judgments.  Second, and most importantly, even if
> the Eastern Bank receipt qualified as actual notice of the sale to Mullane, the
> Mullanes have failed to prove by a reasonable preponderance of the evidence that
> such notice was attained before or at the time of the levy.

> On May 27, 2004, the [c]ourt held that in the specific circumstances of this case,
> the levy, the seizure, was accomplished once the Murphys had left the vessel with
> their pets and personal possessions.  At that time the vessel was in the custody of
> the sheriff's department . . .  The levy or seizure had been completed.  Both Tabit
> and David Wentzell of the Essex County Sheriff's Office testified that Tabit did
> not visit the marina on the day of the levy until after the Murphys had left the
> vessel.  Sometime prior to Tabit's arrival at the marina, Deputy Wentzell called
> Tabit on his cell phone to inform him that someone had suggested that the
> Murphys had reconveyed the vessel back to its original owners, the Walshes.  It is
> unclear from the record whether Deputy Wentzell placed this call to Tabit before
> or after the Murphys had left the vessel.  According to his own testimony, Tabit
> was first informed of the mortgage discharge either during that telephone call, or

upon his arrival at the marina.   Drawing all reasonable inferences from this testimony, the [c]ourt rules that the Mullanes have not shown by a reasonable preponderance of the evidence that (1) Tabit was first informed about the mortgage discharge during Deputy Wentzell's telephone call, or that (2) Deputy Wentzell called Tabit before the levy was completed.   Therefore, the [c]ourt cannot conclude as matter of fact that Tabit had knowledge of the mortgage discharge before or at the time of the levy.

By all accounts, the Murphys appeared to be the owners of the vessel at the time of the levy.   Chambers and Farese were not burying their heads in the sand; they and their attorney performed an appropriate inquiry into the ownership of the vessel before the levy was accomplished.   It was only shortly thereafter that Chambers and Farese learned that the Mullanes had acquired the vessel.

Id. at 195-97 (internal citations, footnotes & quotation marks omitted).

On the other hand, in Hozie v. The Vessel HIGHLAND LIGHT, No. CV 97-4199 ABC BQRX, 1997 WL 1066494 (C.D. Cal. Dec. 8, 1997), another case involving actual notice under § 31321, the court found such notice was present.   Hozie, 1997 WL 1066494, at *4-5.   Therein, Anthony Mignano entered into an agreement to sell a vessel known as the "HIGHLAND LIGHT" to Wayne Hozie.   Id.   at *1.   Mignano either gave Hozie the key or removed the lock from the aft cabin door and, before leaving, said, "Good luck, now it's yours."   Id. at *3.   Hozie began paying the boat's mooring costs, performed repairs and modification, spent vacation time aboard, and took over Mignano's payments to the bank.   Id.   He did not, however, record his purchase.   Id. at *1, 4.   Some eight years later, Curtis Underwood expressed to Hozie his interest in buying the vessel.   Id. at *2.   Hozie told Underwood that he was the owner.   Id.   Although they negotiated, the two could not reach an agreement.   Id.   Two years later, Underwood contacted Mignano's daughter, Susan Horiuchi, about purchasing the vessel.   Id.   She told Underwood she could not sell it to him because she disputed the sale to Hozie, believing that Hozie had stolen the boat from her father.   Id. at *2.   Underwood told her that her signature on a Coast Guard form would "clear the title."   Id.   He then recorded the vessel with the Coast Guard.   Id. at *4.   Since

Underwood knew that Mignano sold the vessel to Hozie, that Hozie possessed the boat and claimed title to it, that Hozie told him he owned the vessel, and that Horiuchi had told him she could not sell it due to the prior disputed sale, the court determined that § 31321(a)(1) prevented Underwood from obtaining legal title against Hozie based on his actual notice of the sale to Hozie by Mignano.  Id. at *5.   Summary judgment in favor of Underwood was, therefore, denied.  Id.

Although it is a much closer case than Hozie, evidence has been presented in this matter, unlike in Mullane, from which a reasonable jury could conclude that Martin had actual notice of the sale to RSK and/or Brown.[6]  Keeping in mind that it must view the evidence in the light most favorable to the nonmovant and that it may not make decisions concerning credibility, it is the opinion of the Court that summary judgment is not appropriate.[7]

<em>CONCLUSION</em>

For the reasons articulated herein, Martin's motion for summary judgment is DENIED.

IT IS SO ORDERED this 23rd day of September 2013.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[6] This includes the knowledge of  Martin's counsel, which is imputed to the Plaintiff.  *See* Mullane, 349 F. Supp. 2d at 195 n.2.

[7] In light of its determination that § 31321 applies to this case, the Court need not address the parties' assertions presented for consideration in the event the Court did not so find.